UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| HEATHER L. PLITZ, *et al.*, ) | |
| ) | |
|     **Plaintiffs,** ) | |
| ) | |
|     v. ) | CAUSE NO. 1:22-cv-00010-HAB-SLC |
| ) | |
| REV RECREATION GROUP, INC., ) | |
| *et al.*, ) | |
| ) | |
|     **Defendants.** ) | |

**REPORT AND RECOMMENDATION**

Before the Court is a motion to enforce settlement agreement or, in the alternative, motion for leave to file supplemental complaint, together with a memorandum in support and exhibits, filed by Plaintiffs Heather Plitz and James Plitz on April 7, 2023, asking that the Court enforce a settlement agreement they entered into with Defendant REV Recreation Group, Inc. ("REV"), in September/October 2022. (ECF 35, 35-1 to 35-5).[1] Alternatively, Plaintiffs seek leave to file a supplemental complaint to advance claims for breach of settlement agreement, violation of the Magnuson Moss Warranty Act, and fraud. (ECF 35 at 5). REV filed a response to the motion to enforce, together with supporting evidence, on May 5, 2023. (ECF 39, 39-1). Plaintiffs filed a reply brief on May 19, 2023, together with a supporting declaration. (ECF 49, 49-1).

On May 24, 2023, District Judge Holly A. Brady entered an Order pursuant to 28 U.S.C. § 636(b) and Northern District of Indiana Local Rule 72-1(b), referring this case to the Undersigned Magistrate Judge to prepare a report and recommendation. (ECF 50). Having now

---

[1] Plaintiffs represent that their settlement agreement with Defendant For Motor Company ("Ford") was fully consummated and is not a subject of this motion. (ECF 35 at 2 n.1).

reviewed the motion, briefs, and supporting materials, I recommend that Plaintiffs' motion to enforce settlement agreement be GRANTED IN PART to the extent that the Court order REV to provide Plaintiffs one additional opportunity to re-evaluate and repair the RV slide outs and to correct two past failed repairs (a sidewall crack and a titled and wobbly driver's seat and pedestal), but that the motion OTHERWISE BE DENIED.

## I. CASE BACKGROUND

Plaintiffs purchased a 2021 Holiday Rambler Invicta 34MB recreational vehicle (the "RV") that was built and warranted in whole or in part by Defendants REV and Ford. (ECF 1 ¶¶ 3, 12). On January 10, 2022, Plaintiffs filed this case against Defendants, seeking to hold them liable for breach of warranty and violations of the federal Magnuson-Moss Warranty Act, the Indiana Deceptive Consumer Sales Act, and the Michigan Consumer Protection Act 331 of 1976. (ECF 1). The Court conducted a preliminary pretrial conference on March 2, 2022, and set various case deadlines, including April 25, 2022, for either party to seek leave to amend the pleadings; March 31, 2023, for the completion of all discovery; and May 1, 2023, for the filing of dispositive motions. (ECF 15, 16).

The parties participated in private mediation on April 20, 2022, but were unable to reach a settlement at that time. (ECF 18). However, on September 21, 2022, the parties filed a joint notice of settlement and request for time to complete terms of settlement, reporting that they had reached a settlement of the case, were in the process of finalizing the settlement agreement, and needed 120 days to complete the settlement. (ECF 19). Accordingly, the Court stayed all case

deadlines and directed the parties to file dismissal papers on or before January 23, 2023. (ECF 20).[2]

On January 23, 2023, Plaintiffs and REV filed a joint motion requesting a thirty-day extension to file dismissal papers, which the Court granted. (ECF 26, 27). On February 23, 2023, Plaintiffs and REV filed a second joint motion to extend the dismissal-papers deadline by thirty days, which the Court granted. (ECF 28, 29). On March 23, 2023, Plaintiffs and REV filed a third joint motion to extend the deadline for dismissal papers, this time by fourteen days, which the Court also granted, making the dismissal papers due on or before April 8, 2023. (ECF 30, 31).

On April 7, 2023, Plaintiffs filed the instant motion to enforce settlement or, in the alternative, motion for leave to file supplemental complaint, together with a memorandum in support and exhibits. (ECF 35, 35-1 to 35-5). The "Confidential Settlement Agreement and Release of All Claims" signed by REV on September 27, 2022, and by Plaintiffs on October 4, 2022 ("the Settlement Agreement"), is attached as an exhibit to the motion. (ECF 35-1). The motion is fully briefed. (ECF 39, 49).

## II. THE TERMS OF THE SETTLEMENT AGREEMENT

In the Settlement Agreement, REV agreed to: (1) pay Plaintiffs $27,000 "inclusive of any and all attorney's fees, courts costs, expert fees and litigation costs"; and (2) provide "the limited repair to Plaintiff's [RV]. . . ." (ECF 35-1 at 1). The "limited repair" is described in the Settlement Agreement as: "REV will provide one-time repairs at its factory in Decatur, Indiana

---

[2] Plaintiffs and Ford filed a stipulation of dismissal on October 7, 2022 (ECF 21), but the District Judge found that the stipulation had no effect and instead granted Plaintiffs to and including October 27, 2022, to file an amended complaint that dismissed its claims against Ford (ECF 22). To date, Plaintiffs have not done so, and thus, Ford remains in the case.

for any *verifiable* coach issues as outlined in the [Plaintiffs'] July 11, 2022, correspondence regarding claimed 'List of Needed Repairs.'" (*Id.* at n.1). The List of Needed Repairs is attached to the Settlement Agreement as Exhibit A and describes twenty-four problems with the RV—thirteen pertaining to the outside of the RV and eleven pertaining to the inside. (*Id.* at 12-14). The Settlement Agreement further states that "REV will provide a one-year warranty on parts and labor for any repairs performed by REV at this factory visit. However, REV will not provide an extended warranty to the Plaintiffs." (*Id.* at 1 n.2).

In turn, Plaintiffs agreed in the Settlement Agreement to "release and forever discharge" REV . . . from any and all liabilities, claims, actions . . . which Plaintiffs have or claim to have had . . . in any way connected with the causes of action and allegations involving the [RV], . . . resulting from the events as described [in this lawsuit.]." (*Id.* at 2-3). Plaintiffs further agreed that: (1) "no further claims or demands will be made against [REV] with respect to the things and events that are the subject of this release or any complaints or allegations associated with the present lawsuit," (2) they "will not file any suit, action or proceeding against [REV] with respect to said subjects," and (3) that "this lawsuit shall be forthwith dismissed, with prejudice . . . ." (*Id.* at 4).

The parties further agreed that the Settlement Agreement "shall be interpreted, enforced and governed by federal law or applicable law under the State of Indiana" (*id.* at 5); that "[t]he Court is to retain jurisdiction to enforce the terms of settlement" (*id.*); and that the Settlement Agreement "contains the entire agreement between the parties and supersedes all prior agreements or understandings relating to the subject matter of [the Settlement Agreement]" (*id.* at 7; *see also id.* at 9).

4

### III. RELEVANT FACTS AFTER THE DATE OF THE SETTLEMENT AGREEMENT

The parties do not dispute that REV timely paid Plaintiffs the $27,000 due under the Settlement Agreement. (ECF 39 ¶ 4; *see* ECF 35-1 at 1). Therefore, the Court need only address those facts relevant to the "one-time repairs" promised by REV under the Settlement Agreement. (ECF 35-1 at 1 n.1).

REV set a November 7, 2022, appointment at its factory in Decatur, Indiana, to perform the one-time repairs on the RV under the Settlement Agreement. (ECF 39-1 at 1). REV arranged for transportation of the RV from Plaintiffs' residence to the factory. (*Id.*).

On January 5, 2023, Barry Krueckeberg, REV's Dispute Resolution Administrator, notified Plaintiffs that the repairs were complete. (*Id.*; *see also* ECF 49-1 ¶ 2). Plaintiffs advised Krueckeberg that they wanted to travel to the factory on Sunday, January 8, 2023, and inspect the RV with him on Monday, January 9. (ECF 39-1 at 1). Krueckeberg agreed that Plaintiffs could stay overnight in the RV before meeting with him on Monday, so they would have time to evaluate the repairs. (ECF 49-1 ¶ 2).

Plaintiffs claim that when they arrived at the factory on the evening of Sunday, January 8, they discovered many of the RV repairs were still unrepaired and that there was still a crack in the side wall. (*Id.*). Unsure what to do, they decided to return home without waiting to meet with Krueckeberg on Monday so they would not miss a work day. (*Id.*; *see also* ECF 39-1 at 2-3).

Plaintiffs' counsel subsequently provided REV with a list of Plaintiffs' additional complaints with the RV. (ECF 39-1 at 2). Plaintiffs claim that REV "agreed to pay some additional monthly payments . . . and pay [their] additional attorney fees" if they afforded REV a second chance to repair the RV in late January, and if Plaintiffs agreed to take the RV with them after that, whether or not Plaintiffs were satisfied with the repairs. (ECF 35-4 ¶ 5). Plaintiffs state

that REV never made either of these payments, but they took the REV home with them anyway. (ECF 35-4 ¶ 5; ECF 49-1 ¶ 3).[3]

On Thursday, January 19, 2023, REV performed additional repairs on the RV at the Decatur factory. (ECF 35-4 ¶ 2; ECF 39-1 at 2). Krueckeberg documented the repairs with photographs. (ECF 39-1 at 2, 26-42). These repairs included: "the sidewall scratch at the entry door, passenger side front windshield pillar, sofa shelf at slide sidewall, sofa shelf by the dinette, corner moldings at the front and rear bedroom slide out, driver side rear window garnish, passenger belt line molding, entry door windshield, and driver side front windshield pillar." (*Id.* at 2). REV also "performed repairs to the wood floor of the luggage compartment," but "did not replace the wood to the ceiling or side panels of the luggage compartment . . . ." (*Id.*). When REV had completed the repairs, Krueckeberg operated the RV slide outs and concluded they operated "as intended and as designed," consistent with the REV factory technicians' conclusions. (*Id.* at 2, 8). Because REV concluded "there was not a verifiable problem with the slide outs," it did not perform any repairs to them. (*Id.*).

After completion of these repairs, REV parked the RV outside so that Plaintiffs could inspect it on Sunday, January 22, 2023. (*Id.* at 2). The next day, January 23, Krueckeberg met with Plaintiffs, who expressed some dissatisfaction with certain repairs, including that a two-inch crack had developed on the side wall sometime after Krueckeberg took his photos three days earlier. (*Id.* at 2, 40-42). Upon inspection of the crack, Krueckeberg concluded that it was not actually a structural crack, but rather "that the paint did not properly adhere to the fiberglass surface, so he offered that REV perform "additional paint repairs" to address it. (*Id.* at 2).

---

[3] The Undersigned declines to take up Plaintiffs' assertion that REV promised them additional monthly payments and reimbursement of attorney fees, as this purported agreement is not included in the Settlement Agreement that Plaintiffs move to enforce.

Due to Plaintiffs' dissatisfaction with its repairs, REV scheduled another factory appointment for the RV on March 13, 2023, to address the remaining issues, offering to transport the RV to the factory. (*Id.* at 3). Plaintiffs, however, did not attend this appointment and have not allowed REV to perform any additional repairs on the RV. (*Id.*). Rather, on February 3, 2023, Plaintiffs obtained an estimate from a third-party consultant, P.G.A. Collision ("PGA Collision"), who estimated it would cost in excess of $16, 920.22 to repair the five remaining problems with the RV (the "PGA Estimate"). (ECF 35-2). Additionally, Plaintiffs obtained an RV Inspection Report ("Inspection Report) from Professional RV Inspections, LLC ("Professional Inspections"), on March 17, 2023. (ECF 35-3).

As stated earlier, on April 7, 2023, Plaintiffs filed the instant motion to enforce the settlement agreement or, in the alternative, motion for leave to file supplemental complaint, contending that REV breached the Settlement Agreement by completing inadequate repairs. (ECF 35). As stated earlier, the motion is fully briefed. (ECF 39, 49).

## IV. THE MOTION TO ENFORCE SETTLEMENT AGREEMENT

In the motion to enforce, Plaintiffs contend that five problems remain with the RV from the List of Needed Repairs after the January 19, 2023, factory visit. (ECF 35-4 ¶ 3). Plaintiffs describe these five problems as REV's failure to: (1) replace the wood in the back baggage areas; (2) remove the wall "to identify and repair the structural defect causing the crack in the side wall that continues to appear after each and ever[y] repair"; (3) replace the belt molding on the left and right side; (4) replace the driver's seat pedestal or repair the driver's seat "so that it sits level"; and (5) properly align the slide outs. (ECF 35-4 ¶ 3). As a result of these unrepaired problems, Plaintiffs claim they do "not feel safe using or driving the RV." (*Id.*).

Plaintiffs further assert in the motion that REV lied to them about the repairs and the

operation of the RV. (*Id*. ¶ 4). Plaintiffs claim that REV told them it replaced the wood in the back baggage area, when it did not, as evidenced by a mark Plaintiffs made on the wood before the repairs which was still there after the repairs. (*Id.*). Plaintiffs further claim that REV told them the "jerking and jumping of the slide out" was normal, but PGA Collision and Professional Inspections both said this is not normal and that the slide outs are out of alignment and not within specifications. (*Id.*).

Based on these problems, Plaintiffs contend that REV is in breach of the Settlement Agreement and ask that the Court enforce it against REV. (ECF 35 at 4). Specifically, Plaintiffs ask that the Court order REV to: (1) pay for PGA Collision to repair the five remaining problems with the RV, a repair estimated in excess of $16,920.22 (ECF 35-2); (2) pay Plaintiffs $10,107.33 in damages resulting from REV's breach of the Settlement Agreement,[4] and (3) pay Plaintiffs' attorney fees resulting from REV's breach of the Settlement Agreement, which totaled $10,256.25 at the time Plaintiffs filed the motion to enforce. (ECF 35 at 4). Alternatively, Plaintiffs ask that the Court grant them leave to file a supplemental complaint pursuant to Federal Rule of Civil Procedure 15(d) to add claims in this lawsuit for breach of the Settlement Agreement, violation of the Magnuson Moss Warranty Act, and fraud. (*Id.* at 5).

## V. APPLICABLE LEGAL STANDARD

"The district court has inherent authority to enforce a settlement agreement reached in litigation pending before it." *Tuttle v. SMS Corp. of Am.*, No. 1:07-cv-1238-DFH-JMS, 2008 WL

---

[4] These damages are comprised of: (1) four monthly RV payments of $908, four monthly payments of $40 for RV storage, four monthly payments of $100 for RV insurance, and four monthly payments of $69.50 for license plate fees; (2) $2,517 to pay Professional Inspections to inspect the RV; and (3) $380.55 in car rental, $1,379.78 in house rental, and $1,360 in flights for a Spring Break trip in which Plaintiffs had planned to use the RV but could not. The total of these damages is incorrectly tallied in REV's motion as $11,007.33 (ECF 35 at 6), but correctly summed in Mr. Plitz's affidavit as $10,107.33 (ECF 35-4 ¶ 5).

4082433, at *1 (S.D. Ind. Aug. 29, 2008) (citing *Carr v. Runyan*, 89 F.3d 327, 331 (7th Cir. 1996); *Wilson v. Wilson*, 46 F.3d 660, 667 (7th Cir. 1995)); *see also Sims-Madison v. Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 448-50 (7th Cir. 2004); *Hakim v. Payco-Gen. Am. Credits, Inc.*, 272 F.3d 932, 935 (7th Cir. 2001). An agreement to settle claims in a federal court is enforceable "just like any other contract." *Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 506 (7th Cir. 2007) (citation omitted). State contract law governs issues regarding the formation, construction, and enforceability of a settlement agreement. *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000).

Under Indiana law—which REV claims, and Plaintiffs do not dispute, governs here (ECF 39 ¶ 11; *see* ECF 35-1 at 5)—an agreement to settle a lawsuit is generally enforceable. *See Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005). As "[s]ettlement agreements are governed by the same general principles of contract law as any other agreement," they require "[a]n offer, acceptance, [and] consideration." *Id*. at 76. "It is established law that if a party agrees to settle a pending action, but then refuses to consummate his settlement agreement, the opposing party may obtain a judgment enforcing the agreement." *Id*. (citing *Georgos v. Jackson*, 790 N.E.2d 448, 453 (Ind. 2003)).

## VI. THE SETTLEMENT AGREEMENT IS VALID AND ENFORCEABLE

"The elements required to form a valid contract in Indiana are '[a]n offer, an acceptance, consideration, and a manifestation of mutual assent.'" *Skertich v. RGS Fin*., No. 2:21 CV 149, 2022 WL 80496, at *1 (N.D. Ind. Jan. 7, 2022) (alteration in original) (quoting *In re Paternity of M.F.*, 938 N.E.2d 1256, 1259 (Ind. Ct. App. 2010)). Here, the parties do not dispute that all of these elements required to form a valid contract under Indiana law were met when they entered into the Settlement Agreement in September/October 2022 to settle all of the claims in this case.

(ECF 35 at 2; ECF 39 ¶ 2). Indeed, the Undersigned's review of the Settlement Agreement reflects that "it is a facially valid and enforceable contract." *Skertich*, 2022 WL 80496, at *2.

As a result, the Undersigned will move on to consider Plaintiffs' assertion that REV breached the terms of the Settlement Agreement. As stated earlier, Plaintiffs contend that REV breached the Settlement Agreement by failing to repair five problems on their List of Needed Repairs.

### VII. PLAINTIFFS' FIVE UNRESOLVED COMPLAINTS ABOUT THE RV REPAIRS

#### *A. Replacement of the Wood in the Baggage Areas*

In their List of Needed Repairs, Plaintiffs describe the following issue with the wood in the back baggage areas:

> #5- All wood in the back to baggage areas needs to be replaced due to the storage areas not being sealed from the factory. So when we do have to drive in rain[,] water got in and now all the wood is bowed and it smells like mildew underneath the back two compartments.

(ECF 35-1 at 12).[5] Plaintiffs claim that REV failed to complete this repair, and further, that REV was dishonest about it. In that regard, Mr. Plitz attests that REV "told [him] that they replaced the wood in the back baggage areas, but [he] knew they did not because [he] marked the wood that was there before repairs and the same markings were on the wood after repairs . . . ." (ECF 35-4 ¶ 4).

In response, REV emphasizes that the Settlement Agreement only required it to perform "one-time repairs" for "verifiable" issues on the List of Needed Repairs. (ECF 39 ¶¶ 3, 8, 17, 20; *see* ECF 35-1 at 1). REV attests that it replaced the wood floor of the luggage compartment but

---

[5] Plaintiffs refer to the "back baggage areas," while REV refers to "the luggage compartment." (*Compare* ECF 35-4 ¶ 4, *with* ECF 39-1 at 2). The Court presumes these two areas are one and the same.

"did not replace the wood to the ceiling or side panels of the luggage compartment, as there was no water damage in these areas." (ECF 39-1 at 2; *see id.* at 6, 39). REV's repair order also reflects that it installed extra screws for additional support of the ceiling panel. (*Id.* at 24). As such, REV's position is that Plaintiffs' complaint of water damage to the wood in the ceiling or side panels of the luggage compartment was not a "verifiable" problem at the factory visits, and thus, REV had no obligation to replace these materials. (*See* ECF 39 ¶¶ 20-21; ECF 39 at 2).

In reply, Plaintiffs cite the PGA Estimate and the Inspection Report as evidence to dispute REV's claim that the wood in the ceiling and side panels had no water damage. (ECF 49 at 4). The PGA Estimate, however, does not actually lend support to Plaintiffs' cause. While it summarizes Plaintiffs' complaints about possible leaks in the back baggage areas, the PGA Estimate does not actually describe the condition of the baggage areas. (*See* ECF 32-2 at 5). Nor does the Inspection Report document water damage to the wood in the ceiling or side panels of the back baggage areas. Rather, the Inspection Report reflects that the "Cargo / Storage Bay Doors" are in "Fair" condition (ECF 35-3 at 7), defined in the Report as follows: "The item or its components is not in need of immediate repair but wear and tear exists and the item is not in optimum condition. Some opinions may elect to repair or replace this item now while others may wait." (*Id.* at 4).

After applying the "Fair" rating, the Inspection Report does go on to note that "the second to last cargo bay" has a "sizable gap between the ceiling of the cargo bay and the outside frame" which "can allow for drafts and possible pest intrusion," and a "sagged" ceiling due to the screws in the ceiling not being secured to anything. (*Id.* at 7, 38-40). Yet, there is no documentation of water damage to the back baggage areas or that the wood in the ceiling and side panels must be replaced. Consequently, Plaintiffs have failed to carry their burden of

showing that REV breached the Settlement Agreement by replacing only the wood on the floor of the luggage compartment, but not the wood on the ceiling and side walls of the compartment.

### B. The Crack in the Side Wall

Plaintiffs' second remaining problem with the RV is a recurring crack in the side wall. Plaintiffs describe the problem as follows in the List of Needed Repairs:

> #8- Crack in side wall under drivers side slide out needs to be fixed again. It was suppose[d] to be fixed but it's cracked again after only 250 miles back to Michigan from factory. We would want the entire wall removed and inspected because something is broke structural wise under slide making it crack again.

(ECF 35-1 at 12). REV states that it repaired this crack again in late January, but it apparently reoccurred within three days after the RV was parked outdoors. (ECF 39-1 at 2). REV disagrees with Plaintiffs' characterization of the issue as a "structural crack" necessitating a wall removal, asserting that it is actually just a crack in the "paint surface" where the paint did not properly adhere to the fiberglass wall due to a "temperature issues during the paint curing process." (*Id.*). It faults Plaintiffs for refusing to let REV fix the paint surface crack, emphasizing that REV "remains ready, willing and able to address any remaining issues with the prior repairs performed on the [RV] in accordance with the one-year warranty on parts and labor, as provided in the [S]ettlement [A]greement." (*Id.* at 3).

In response, Plaintiffs again rely on the PGA Estimate and the Inspection Report to support their position that REV breached the Settlement Agreement by "fail[ing] to remove the wall to identify and repair the structural defect causing the crack in the side wall . . . ." (ECF 49 at 4). The PGA Estimate notes that the "stress crack" had been repaired four times, and that in PGA's experience, "this type of crack is due to a structural issue," requiring the removal of the outer wall to inspect and complete the structural repair. (ECF 35-2 at 2). Similarly, the

Inspection Report documents "a crack of approximately one inch . . . in the filon and . . . paint chipped in this area," and "highly recommend[s]" "[f]urther evaluation as to the integrity of the wall structure in this area." (ECF 35-3 at 7, 44).

The fact remains that REV did repair the crack in the sidewall on the List of Need Repairs in January 2023 (ECF 39-1 at 2, 18), though the repair later failed. While REV apparently did not remove the entire wall and inspect the structure at the time as Plaintiffs desired, REV needed only to repair "verifiable" issues under the Settlement Agreement. It was REV's view at the time that the crack in the sidewall was not structural in nature. (*Id.* at 2). That the Inspection Report later recommended further evaluation of the integrity of the wall structure does not rise to the level of evidence upon which to conclude that REV breached the Settlement Agreement at the time it completed the repair. It is undisputed that REV remains willing to attempt to remedy this repair again pursuant to the one-year warranty on parts and labor provided in the Settlement Agreement, but Plaintiffs have not allowed REV the additional opportunity to do so. (ECF 39-1 at 3). Consequently, Plaintiffs' assertion of breach of the Settlement Agreement is premature at this juncture.

### C. Replacement of the Side Belt Moldings

Plaintiffs' third remaining problem with the RV is a "fail[ure] to replace the belt molding on the left and right side." (ECF 35 at 3). Plaintiffs describe this problem on the List of Needed Repairs as:

> #10- The trim pieces that go down the entire length of the [RV] are coming apart. We want all new parts due to them not being fixed or there was just caulk put in place to try and hold them together.

(ECF 35-1 at 12). Plaintiffs cite the PGA Estimate in support, but again it merely summarizes Plaintiffs' complaints about missing belt line molding, so it is not particularly helpful. (ECF 35-2

13

at 2). The Inspection Report assessed the sidewall "Sealants" as "Fair," but noted there "appears to be sealant separation at the front and rear ends of the forward belt line trim." (ECF 32-3 at 6, 36-37). The Inspection Report does not, however, state that the belt line molding must be replaced.

REV does not specifically address this repair in its response brief, but Kruekeberg attests that repairs were performed to the RV's "corner moldings at the front and rear bedroom slide out" and the "passenger belt line molding." (ECF 39-1 at 2, 31-32, 34-36). REV also produced a repair order that evidences the work performed, which reflects that REV "[i]nstalled additional beltline retainer clips at the splices." (*Id.* at 19). As such, it is clear that REV did complete a repair on the belt molding line in January 2023. That Plaintiffs want the molding replaced, rather than repaired, does not rise to a level of a breach of the Settlement Agreement by REV, as Plaintiffs fail to produce any evidence that the belt line molding required replacement. If REV's repair subsequently failed, then REV remains willing to remedy the repair pursuant to the one-year warranty on parts and labor provided under the Settlement Agreement. (*See id.* at 3). Plaintiffs, however, have not allowed REV another opportunity to do so. (*Id.*).

### D. Replacement of the Driver's Seat and Pedestal

Next, Plaintiffs cite their persistent problem with the driver's seat and pedestal of the RV, described in their List of Needed Repairs as:

> #3- Drivers seat is still broke even after having a new one installed. The seat is worse now th[a]n it has ever been, not only does it still rock side to side[,] it now rotates around about a[n] inch each way while trying to drive. We want a whole new pedestal and seat again.

(ECF 35-1 at 13). In support, Plaintiffs cite the PGA Estimate, which states that the "Driver's seat is not seated properly. Sits on a slant. . . . Seat must be disconnected and removed in order to

14

inspect seat base and floor to diagnose problem." (ECF 35-2 at 2). Similarly, the Inspection Report, while rating the driver's seat condition as "Fair," states:

> When looking at the driver seat from the rear, there is a very noticeable tilt to the right. The seat itself also appeared wobbly. Using a bubble level across the top of the back rest the bubble level was noticeably off. When the bubble level was placed across the seat, the level was noticeably off; the same as it is at the top of the back rest. When the bubble level was placed on the floor, the level was even. By comparison, the passenger seat was fairly level in the same areas. Further evaluation of the seat and the mounting system [is] highly recommended.

(ECF 32-3 at 7).

REV does not specifically address the driver's seat or pedestal repair in its response brief; nor does Krueckeberg mention it in his affidavit. REV did, however, produce a repair order reflecting that it replaced the driver's seat and "[a]dded shims to pedestal to take the wobble out." (ECF 39-1 at 11). As such, it is clear that REV repaired the driver's seat and pedestal problem in January 2023 in accordance with the Settlement Agreement. But given the evidence in the PGA Estimate and the Inspection Report, REV's repair obviously failed again thereafter. Again, it is undisputed that REV remains willing to remedy any repair pursuant to the one-year warranty on parts and labor provided in the Settlement Agreement, but Plaintiffs have not afforded REV the opportunity to do an additional repair. (ECF 39-1 at 3). Consequently, the failure of REV's driver's seat and pedestal repair does not rise to the level of a breach of the Settlement Agreement by REV at this juncture. Rather, the remedy provided under the Settlement Agreement to Plaintiffs is to seek another repair of the driver's seat under the one-year warranty on parts and labor.

### E. Failure to Properly Align the Slide Outs

Plaintiffs' fifth remaining issue is their assertion that REV "failed to properly align the slide outs" of the RV (ECF 35 at 3), which Plaintiffs describe in their List of Needed Repairs as:

15

> # 13- Both slides do not extend and retract smoothly[;] they jerk and jump back and fo[]rth. We have had them looked at and told they were fine but there is absolutely something wrong with them. Plus both slides are not square from top to bottom. We believe they were not installed properly and this could be a structural problem with walls of [RV] and we are not sure if they could even be fixed.

(ECF 35-1 at 13). The PGA Estimate reflects that Plaintiffs recently noticed two cracks under the bedroom slide out—which are not included in the List of Needed Repairs—and PGA's opinion that the "bedroom slideout is not seated properly, [which] may be cause of stress cracks in sidewall." (ECF 35-2 at 3-4). Likewise, the Inspection Report notes "two small hairline cracks . . . in the filon at the bottom rear of the slideout opening." (ECF 35-3 at 6). It rates the "Streetside Slideout" as "Fair," stating: "When retracting the slide out, some slight jerking motion was noticed. The slideout was operated multiple times and this was noticed on each occasion. Further evaluation recommended." (ECF 35-3 at 6, 20-22).

REV, however, responds that Plaintiffs' complaint about the operation of the slide outs was not verifiable when it assessed the RV so no repairs to the slide outs were necessary. (ECF 39-1 at 2). Krueckeberg attests that on January 19, 2023, he "operated both slide outs . . . after REV performed its repairs and both slide outs operated as intended and as designed," and that his "findings were consistent with the REV factory technicians who also tested the slide outs several times and noted on the repair records that the slide outs operated correctly." (*Id.* at 2 (citation omitted)). Indeed REV's repair records reflect the same. (*Id*. at 8, 11). Consequently, REV's failure to repair the slide outs is not a breach of the Settlement Agreement, given that REV could not verify Plaintiffs' complaints about the slide outs at the time of the factory repairs in January 2023.

Having said that, Plaintiffs have since obtained their own third-party opinions from PGA

16

Collision and Professional Inspections, both of which opine that there *is* a verifiable problem with the RV slide outs. As explained below, given this evidence, the Undersigned interprets the Settlement Agreement as still affording Plaintiffs an opportunity for a one-time repair of the slide outs by REV, so that REV can re-evaluate and, if needed, repair the slide outs in light of Plaintiffs' third-party evidence.[6]

### VIII. SUMMARY AND RECOMMENDATIONS

Ultimately, Plaintiffs' assertion that REV breached the terms of the Settlement Agreement is either unsupported on this record or premature, given that Plaintiffs have not fully availed themselves of the one-year warranty on parts and labor included in the Settlement Agreement. Having said that, it is clear on the record presented that additional repairs are still necessary to the RV under the one-year warranty provided in the Settlement Agreement to resolve: (1) the reoccurring crack in the side wall, and (2) the driver's seat and pedestal tilt and wobble.[7] Additionally, given that Plaintiffs have since produced third-party opinion evidence of verifiable problems with the slide outs, REV should afford Plaintiffs an opportunity for a one-time re-evaluation and repair of the slide outs under the Settlement Agreement, which REV did not repair in January 2023. Consistent with the Settlement Agreement, REV should pay for the cost of a transportation company to transport the RV from Plaintiffs' home to REV's factory in

---

[6] Contrary to Plaintiffs' assertion, the fact that REV's opinion about the operation of the slide outs in January 2023 differs from the subsequent opinions of PGA Collision and Professional Inspections, standing alone, fails to establish "dishonesty" or "fraud" by REV about the operation of the slide outs. (*See* ECF 35 at 3).

[7] REV asserts that Plaintiffs did not comply with their obligations under the Settlement Agreement when they returned home on January 8, 2023, instead of attending their scheduled meeting with Krueckeberg at the factory on January 9, 2023. (*See* ECF 39 ¶ 5) ("The [Settlement Agreement] also required the Plitzes to go over the repairs with a factory representative . . . to inspect the coach and go through the repairs after the repairs are performed."). Not so. The Settlement Agreement provides that "Plaintiffs will have *the opportunity* to inspect the coach at REV's factory in Decatur with a designated REV representative to inspect the coach and go through the repairs after the repairs are performed," not *an obligation* to do so. (ECF 35-1 at 2 (emphasis added)).

Decatur, Indiana. (*See id.* at 2 n.3).

At that factory visit, REV should also evaluate and repair both the crack in the sidewall and the tilted and wobbly driver's seat and pedestal under the one-year warranty in the Settlement Agreement. Given that the crack in the side wall has been fixed four times previously, yet has recurred after each repair (ECF 35-2 at 2), the Court expects REV to consider and evaluate whether the crack necessitates a structural repair as advised by PGA Collision and Professional Inspections (*id.*; ECF 35-3 at 7), rather than merely the "additional paint repairs" that REV previously recommended (ECF 39-1 at 2).

One final matter. As stated earlier, the Settlement Agreement is a valid and enforceable contract between the parties. In executing the Settlement Agreement, Plaintiffs released and discharged all their claims against REV in this lawsuit, and therefore, this action can now be dismissed. (*See* ECF 35-1 at 4 ("The Plaintiffs further covenant, warrant and represent that this lawsuit shall be forthwith dismissed, with prejudice, and by the signing of this instrument authorize and direct their attorneys of record to dismiss, with prejudice, any and all such actions or proceedings.")). Therefore, the Court can order the parties to execute and file the dismissal papers by a date certain, so that this case can be dismissed with prejudice in accordance with the Settlement Agreement. Having said that, if this case is dismissed with prejudice, the Court can no longer entertain disputes between the parties and can only enforce the Settlement Agreement if there is an independent basis for federal subject matter jurisdiction with respect to the new controversy. *See Morisch v. United States*, 709 F. Supp. 2d 672, 676 (S.D. Ill. Apr. 6, 2010) (collecting cases).[8] As such, the Undersigned will leave it to the District Judge to decide whether

---

[8] While the Settlement Agreement provides that the Court is to "retain jurisdiction to enforce the terms of the settlement," that language, standing alone, is insufficient for the Court to retain jurisdiction once it dismisses the case. *See id.* at 675 ("In general, a court retains jurisdiction over a settled and dismissed case 'if the parties'

to keep this case solely for the purpose of enforcing the Settlement Agreement, or whether to dismiss this action, leaving the parties to file any future claims for breach of the Settlement Agreement in state court.[9]

### IX. CONCLUSION

As explained above, the Undersigned RECOMMENDS that Plaintiffs' motion to enforce Settlement Agreement (ECF 35) be GRANTED IN PART to the extent that the Court ORDER:

(1) REV to afford Plaintiffs a one-time re-evaluation and repair of the RV slide outs under the Settlement Agreement at REV's factory in Decatur, Indiana, given Plaintiffs' third-party opinions documenting issues with the slide outs, with REV paying for the cost of transporting the RV to its factory in accordance with the Settlement Agreement; and

(2) REV to afford Plaintiffs, at that factory visit, additional repair of both the crack in the sidewall and the tilted and wobbly driver's seat and pedestal under the one-year warranty on parts and labor in the Settlement Agreement, given Plaintiffs' third-party opinions documenting that REV's "one-time repairs" of these issues have since failed;

---

obligation to comply with the terms of the settlement agreement ha[s] been made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order.'" (alteration in original) (quoting *Bond v. Utreras*, 585 F.3d 1061, 1079 (7th Cir. 2009)).

[9] While Plaintiffs assert that permitting them to assert a breach of Settlement Agreement claim in this action "will be more efficient and effective" over filing a separate action in state court, the Undersigned is not convinced, given that this case was still in a relatively early stage of the litigation when it settled, any future claim for breach of Settlement Agreement could involve material factual disputes and would be governed by Indiana law, and the amount in controversy flowing from any such breach may be well below the $75,000 diversity jurisdiction threshold.

but that the motion to enforce Settlement Agreement (ECF 35) be OTHERWISE DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to the parties' counsel. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Civ. P. 72(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. *See Brokaw v. Brokaw*, 128 F. App'x 527, 530 (7th Cir. 2005); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

SO ORDERED.

Entered this 17th day of November 2023.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge